FANCHON & MARCO, INC., FANCHON & MARCO ENTERPRISES, INC., and FANCHON & MARCO SERVICE CORPORATION, v. JOHN S. LEAHY, LAMBERT E. WALTHER, and HAROLD F. HECKER, Appellants.—No. 37801.—173 S. W. (2d) 417.

Division One, May 4, 1943.

Rehearing Denied, July 6, 1943.

Motion to Transfer to Banc Overruled, July 20, 1943.

*Rassieur & Rassieur* and *Wm. O'Herin* for appellants.

*Burnett, Stern & Liberman* for respondents.

432

HYDE, J.—This is an action in equity seeking to cancel notes held by defendants aggregating $42,800.00, to enjoin suits commenced on three of these notes totaling $600.00, and to have judgment for $42,200.00 paid to defendants, all for attorney's fees. The court entered a decree canceling the notes and entering a money judgment for the net amount of principal and interest of $33,500.63. (Being $32,200.00 principal, less $1,323.09 credit for value of bonds received by plaintiffs, plus $2,623.72 interest.) Defendants have appealed.

Plaintiff Fanchon & Marco, Inc., alleges that defendants were employed by it and acted as its attorneys from February 1, 1934, to December 3, 1936. (By plaintiff as hereinafter used we mean plaintiff Fanchon & Marco, Inc., since the other two plaintiffs are subsidiary corporations, incorporated in Missouri, interested only because they endorsed the notes given to defendants.) The basis of this action as charged in the petition is that defendant John S. Leahy (hereinafter referred to as defendant since all charges are made against him), being senior partner of defendant's firm was guilty of breaches of professional conduct, so as to forfeit all right to compensation, as follows:

1—That in February, 1934, defendant, unknown to plaintiff, contributed one-half of the purchase price of the stock interest of Allen Snyder in two corporations which plaintiff claims that defendant was employed by it to organize for its benefit, and that it was his duty

to plaintiff as its attorney to make a full and complete disclosure of his private interest in the subject matter.

2—That these corporations, operating moving picture theatres, were sustaining heavy operating losses, because of a conspiracy in restraint of trade to deprive them of films concerning which plaintiff made complaint to the Department of Justice of the United States, and in which complaint defendant represented plaintiff; that during this period defendant advised plaintiff to buy Snyder's interest; that in January, 1935, plaintiff did so (paying him his original purchase price of $25,000.00) being ignorant of defendant's interest; and that this stock was then without substantial value.

3—That in April, 1936, after defendant at plaintiff's request, had induced the Attorney General of Missouri to bring state anti-trust suits against certain film companies, defendant failed to ask the Attorney General to delay filing such suits and discontinue any such proceedings because of pending negotiations for settlement with the companies, as plaintiff thereafter had requested him to do.

Plaintiff very clearly states the controlling fact issues decisive of these contentions, as follows:

. (1) The question whether an attorney and client relationship existed between the plaintiff and the defendant from and after February 1, 1934;

(2) the concealment by the defendant of his investment with Snyder in the theatre and his subsequent conduct until and after the sale of Snyder's interest;

(3) defendant's conduct in connection with the state anti-trust suits:

(4) the question as to whether Harry Arthur (who was plaintiff's representative in handling these matters) had learned of the alleged violations by defendant of his professional obligations before he made the agreement in December, 1936, for the fees to be paid by the plaintiff for the legal services rendered by the defendant.

This case being in equity and considered here de novo, it is necessary to review all the evidence. Since this is before us in a printed record of three volumes containing 2257 pages, it is obviously impracticable to do more than state a narrative outline of the facts. We think this matter can be logically divided into two parts (although these are somewhat interrelated) as follows:

I. The period from January, 1934, to January, 1935, inclusive, during which defendant, by negotiations with the bondholder's committee for certain theatres in receivership obtained leases and approval thereof by the United States District Court and organized corporations to operate them, working under an oral contract for a fee of $10,000.00 paid to him in September, 1934. This period runs to the end of January, 1935, when plaintiff purchased the interest of Snyder, in whose name the bids for the leases were made to and

accepted by the bondholders committee which had reorganized [419] the companies holding title to the theatres. The events of this period determine the first two points stated above as the basis of plaintiff's claim and also the first two of the controlling fact issues involved and have considerable bearing on the fourth. The decree did not require defendant to pay back the $10,000.00 fee received during this period.

II. The period from February, 1935, to December, 1936, inclusive, during which defendant worked under a written contract for services made in April, 1935. During this period anti-trust indictments brought by the Federal Government were tried and anti-trust equity suits were brought by both the United States and the State of Missouri and settled by agreement. Defendant's services in connection with these cases began in the fall of 1934 before the written contract was made. For defendant's services under this written contract, plaintiff, by settlement contract made in December, 1936, agreed to pay defendants $75,000.00. Notes were given for $65,000.00 and $10,000.00 was paid in cash. The decree cancelled all of these unpaid notes amounting to $22,800.00 and required defendants to pay back the $10,000.00 paid in cash and also all amounts paid on notes which totaled $22,200.00.

I. *Events of First Period—January, 1934, to January, 1935, Inclusive.*

This story begins in 1933, when defendant met Mr. Arthur, plaintiff's vice-president, by reason of being attorney for the receivers of Theatre Realty Company of St. Louis, which owned the Fox Theatre there. (The receivers were Judge James T. Blair and Ed Koeln.) Arthur had then had much experience in the moving picture business and was negotiating leases for theatres. His headquarters were in New York and he was acting principally through F. & M. Stageshows, Inc., a subsidiary corporation of plaintiff. In 1933, he had acquired a half interest in a Missouri corporation called the Eden Theatre Corporation (hereinafter called Eden) operating the St. Louis Theatre on Grand Boulevard; the other half interest being owned by a group headed by a banker, Mr. A. W. Waldheim, which had acquired ownership of the fee through a defaulted bond issue. Mr. Arthur at this time became acquainted with Mr. Harry Koplar who was employed as Manager of the St. Louis Theatre. Arthur negotiated for a lease of the Fox Theatre, for the duration of its receivership, with defendant and the receivers he represented, and this lease was agreed upon in January, 1934. (This receivership continued from January, 1932, to September, 1935.) This lease was likewise taken in the name of Eden. About this time, two other companies owning theatres went into receivership. These were the Central Properties Corporation, owning the Ambassador and New Grand Central theatres; and the St. Louis Properties Corporation, owning the Mis-

souri Theatre. The bonds of these companies were personally guaranteed by the Skouras Brothers, and others, who had been connected with these companies and were operating these theatres.

This brings us to the first phase of this case, the events of 1934. A Bondholders Committee was organized by Mr. T. N. Dysart to foreclose and obtain the title for companies reorganized for the benefit of the bondholders, and then to lease these theatres. In the latter part of January, 1934, Koplar began negotiations for these leases, raising $25,000.00 with the aid of his brother-in-law Dr. J. G. Probstein for this purpose. It soon became apparent that more money would be required. Koplar then tried to interest Arthur. Defendant about the same time had suggested the matter to Arthur and told him that the Dysart Committee "wouldn't accept a bid from Koplar and that he was looking for someone to join with Koplar". Arthur told defendant: "I didn't want to go into it for the same reasons that I had told Koplar". Concerning these reasons he said: "I had been informed Skouras would undoubtedly get the leases on the theatres; that the only purpose I could serve would be to raise the price as far as Skouras was concerned and I didn't want to incur Skouras' enmity". The Skouras Brothers had connections with Warner Brothers and other film producers who furnished film to these St. Louis theatres and also to theatres on the Pacific Coast which were operated by or affiliated with plaintiff. Defendant told Arthur that he had a man, Mr. Allen Snyder of St. Louis, who would go into the deal with Koplar. Snyder did make a bid for the leases on the basis of a $50,000.00 deposit with the Committee.

Thereafter (and there is some controversy concerning when this occurred) Arthur told defendant "We would go in because Skouras had charged me with the responsibility of controlling Koplar, and if Koplar made a bid, or was active in any way, [420] he would consider it an unfriendly act on our part and take away our film service on the Fox and St. Louis Theatres, and I had explained to Skouras that we couldn't possibly control Koplar. · I told Skouras that if he still charged me with the responsibility of controlling Koplar, which I couldn't do, that the only way I could serve myself was by joining forces with Koplar and try and get the leases away from Skouras so that Skouras would not be in a position to take any film away from us at the Fox and St. Louis Theatres". (Skouras enmity arose out of litigation Koplar had with Warner Brothers and Skouras prior to his association with Arthur.) Arthur testified: "The terms on which we would go in had been proposed before that, by Mr. Leahy, that we would take a half interest and put up half the money ourselves and that we would manage the property and receive 5 per cent management fee. There were several sums discussed which would be needed; the one that stuck out in my mind was $100,000.00, and it would be necessary for us to put up $50,000.00. Mr. Leahy said the

other half was being put up by Mr. Snyder and Mr. Koplar, each putting up $25,000.00''. Arthur could not fix the date when he notified defendant and Koplar that the would participate, but said it was prior to February 14th. Up to that time defendant had never been employed as attorney for Arthur or for any firm with which he was connected.

Snyder had insisted on defendant coming in with him and defendant said he wouldn't recommend a thing he wouldn't go into, so on January 25, 1934, he told Snyder he would go in for half of his part. (About half of this amount defendant put in was furnished by another man, Mr. Lamy.) Snyder was at that time promoting a company to make small storage batteries for use in hearing devices. Defendant owned one-fourth of the stock in that company and served on its board of directors. The first bid by Snyder (on the basis of $50,000.00 deposit) on behalf of himself and Koplar was made on January 26th. At that time, they had agreed with defendant that he would undertake to procure the leases, and, if successful would incorporate two companies to hold the leases, for a contingent fee of $10,000.00. If they failed to obtain the leases then Snyder and Koplar would pay his out-of-pocket expenses only. Arthur said that he learned of this agreement from Koplar before he announced he would go into their syndicate, to obtain the leases and organize corporations to hold them, and "accepted it as part of the deal". He also said he had no dealings with Snyder, before he came in, "as to a management contract which Fanchon & Marco would expect from these new corporations in the event they secured the leases"; but had told defendant that "we would not consider under any circumstances going in unless we managed the theatres . . . and we were to get 5% for doing it, 5% of the gross receipts . . . irrespective of whether the receipts would show profit or loss". Arthur also said at that time he considered that defendant was attorney for Koplar and Snyder to get the two theatres, and that although he did not make such a management agreement with Snyder Koplar had agreed to it.

After Snyder came in, all bids were made in his name. It was understood, however, that some nationally known organization would be associated with him in operating the theatres. Arthur said: "It was the consensus of opinion of all of us that it would serve our purpose better not to announce who were the associates of Koplar and Snyder until we had been awarded the theatres". The Committee finally agreed to accept the bid made by Snyder on February 5th on the basis of a deposit of $105,000.00. Defendant notified Arthur and he came to St. Louis, meeting there Mr. Marco Wolff, one of the owners of plaintiff on February 14th. Wolff left checks on California banks with Mr. Koeln, president of the American Exchange National Bank in St. Louis, for $50,000.00 with instructions to deposit them in the name of Marco Wolff, individual, when notified that "a lease is made in accordance with the contract between Thomas N. Dysart

and Allen L. Snyder". All the parties concerned in the deal went to Chicago on February 17th where they conferred with Mr. Levinson, the Chicago attorney for the committee, for several days. On February 19th, after the leases for the threatres had been agreed upon and prepared, Wolff gave Snyder his check for $50,000.00 on this St. Louis bank. The money was put up with the bondholders committee on February 21st. $50,000.00 had been deposited by Snyder and Koplar and the remaining $5,000.00 had been brought in by Harry Greenman and Charles Kurtzman, $2,500.00 each, employees of the Eden Theatre Company at the Fox and St. Louis [421] Theatres. Later on in August, 1934, just before the theatres were opened, Arthur advanced $5,000.00 more for expenses. Snyder and Koplar were to advance an equal amount but never did. Snyder waited on Koplar and Koplar claimed that Arthur told him it was not necessary. The note of plaintiff was given to Wolff for the $50,000.00 advanced by him.

At this point, it is pertinent to consider the character and ramifications of plaintiff's organization. Plaintiff was a holding company originally organized by Marco Wolff and his sister Fanchon Simon. It was a California corporation with capital stock of ten shares owned in 1934, as follows: Marco Wolff 3, Fanchon Simon 3, Harry Arthur 2 and Jack Partington 2. It owned and rented theatrical and studio equipment which had cost more than one million dollars. It also operated booking offices and produced stage shows. Its books showed a surplus of $62,573.00 on December 31, 1933, and $101,295.17 on December 31, 1934. However in 1934, all of its stock was transferred to another holding company, the Transcontinental Amusement Corporation, a Delaware corporation. Forty per cent of the Transcontinental stock was owned by the Globe Operating Company, a New York corporation and the rest was issued to the original owners of plaintiff. Other subsidiaries which were completely owned by plaintiff or Transcontinental were F. & M. Stage Shows, Inc., a New York corporation, Fanchon & Marco School of the Theatre, a California corporation, and Fanchon & Marco Agency, Inc., a Delaware corporation. There were also a number of wholly owned subsidiary corporations operating theatres in California, Colorado, Utah, New York and other states. There were also other operating companies, in which plaintiff, Transcontinental or one of its subsidiary holding corporations owned part of the capital stock, which were referred to as affiliated corporations. The Eden Theatre Company (in which plaintiff owned a half interest was one of these), the St. Louis Ambassador Theatre, Inc., and the St. Louis Missouri Theatre, Inc., were other Missouri corporations in this category. It also appears that plaintiff's original interest in Eden was subsequently owned by F. & M. Theatres of Missouri, Inc., another subsidiary of Transcontinental. There were other subsidiary corporations, such as the two other

plaintiff corporations in this case whose purposes and functions are not fully explained in the record.

The $50,000.00 furnished by Marco Wolff, February 19, 1934, for half of the leasehold deposit, required by the Dysart Committee, was first shown on the books of plaintiff in March, 1934. Plaintiff did not pay out this money but assumed an obligation to pay it to Wolff. It was entered on the asset side as "accounts receivable Fanchon & Marco, Inc., of Missouri, $50,000.00", and on the liability side as "Notes payable Marco Wolff, $50,000.00." (It was admitted that there never was any such corporation as Fanchon & Marco, Inc., of Missouri.) Whether or not plaintiff ever did pay Wolff is not shown. On March 28, 1935, this asset entry was changed to "Investment in affiliated companies, $50,000.00", and was explained as an entry "to transfer F. & M. Theatres of Missouri to proper place". Thereafter, on August 15, 1935, this was changed again to: "Investment in affiliated companies St. Louis Ambassador Theatre, Inc., debit $33,333.33, St. Louis Missouri Theatre, Inc., $16,666.67; investment in affiliated companies F. & M. Theatres of Missouri, credit $50,000.00".

The payment of the $10,000.00 fee was made to defendant, on September 27, 1934, by check of the St. Louis Ambassador Theatre, Inc. This was shown on its books as a deferred charge on the asset side under "leasehold". This account was credited with $3,333.34, which amount was shown as "accounts receivable, St. Louis Theatre, Inc." All amounts received by defendants during 1934, for travel expense, telephone calls and other expense, were likewise paid by check of the Ambassador. The $5,000.00 advanced August 3, 1934, was by check of the F. & M. Stage Shows, Inc., and was not charged on plaintiff's books until September, 1937, when there was a merger of plaintiff and Transcontinental. The Ambassador's books, from August 3, 1934, to October 29, 1936, showed this (and later advancements) to be due to Harry Arthur. After this later date, and until September, 1937, it was carried as due Transcontinental.

After the terms of the leases were agreed upon in Chicago, it was necessary for the Dysart Committee to get title to the theatres by foreclosure (which was done on June 7th) and also to obtain approval of their plan of reorganization by the Federal Court in St. Louis in which [422] the receivership proceedings were pending. The Skouras Brothers employed attorneys who filed exceptions and the reorganization plans were not finally approved until June 20, 1934. An appeal was taken by the opposing interests but this did not prevent completion of the leases to Snyder. The two theatre corporations were organized (articles filed July 17th) and on July 19th Snyder assigned the lease from Dysart dated February 20, 1934, upon which $70,000.00 had been deposited, to the St. Louis Ambassador Theatre, Inc. (Referred to herein as Ambassador). This lease covered the Ambassador and New Grand Central Theatres. At the same time he also assigned

the lease of the Missouri Theatre, upon which $35,000.00 had been deposited, to the St. Louis Missouri Theatre, Inc. (Referred to herein as Missouri.) The capital stock of the Ambassador was $70,000.00, which was shown paid by Snyder by assignment of the lease for the two theatres. The capital stock of the Missouri was $35,000.00 likewise shown paid by Snyder by assignment of the lease of that theatre. Arthur was president of each company, Snyder was vice-president and treasurer, and Greenman was secretary. The theatres opened in August, 1934.

Immediately after the organization of the two theatre companies there was a controversy between Arthur and Snyder concerning the matter of how the stock was to be issued. Snyder said because of the work he had done in securing the leases that Arthur should pay $55,000.00 for his half interest. Arthur contended that 50 shares of stock should be issued to Greenman and Kurtzman, while Snyder claimed that the original agreement was that Arthur and his associates should have exactly the same amount of stock as Snyder and Koplar. Snyder claimed that Greenman and Kurtzman should be considered as creditors rather than as stockholders. This argument continued throughout Snyder's connection with the company.

On August 22, 1934, both Arthur and Wolff instructed Snyder to issue stock of the two corporations as follows: Ambassador, 331 1/3 shares to Transcontinental, 2 shares to Arthur, 16 2/3 shares to Kurtzman, 16 2/3 shares to Greenman, 166 2/3 shares to Snyder, 166 2/3 shares to Koplar; Missouri, 164 2/3 shares to Transcontinental, 2 shares to Arthur, 8 1/3 shares to Kurtzman, 8 1/3 shares to Greenman, 83 1/3 shares to Snyder, 83 1/3 shares to Koplar. Snyder continued to hold all the stock in his own name except qualifying shares issued to directors.

Arthur also claimed that one of plaintiff's subsidiaries, F. & M. Stage Shows, Inc., should have the management contract for the St. Louis theatres for 5% of the gross receipts. Snyder never agreed to this but offered to contract on the basis of 3%. The leases contained a provision stating that: ''The Lessee may secure and employ nationally known and expert showmen and theatre operators to conduct the performances in the demised premises whose names it is agreed may appear at any place selected by the Lessee as the operators of said theatre, but Lessee shall not pay such theatre operators for such services a sum in excess of five (5%) per cent of the gross receipts received from the operation of said theatre''.

Another matter which Snyder and Arthur frequently discussed was securing films for the theatres. The Skouras Brothers were unfriendly because they were not able to get the leases and continue in operation of the theatres. Because of their connections with Warner Brothers, they were able to prevent the Ambassador and the Missouri from getting either Warner Brothers or Paramount films. It also

later developed that R-K-O films could not be obtained either. Officers of Warner Brothers made threats that they would ruin any company or group which leased the theatres from the Dysart Committee. The parties were relying upon Arthur to obtain film contracts and Snyder felt that he had not begun early enough to get them. Arthur did have contracts for Fox and Columbia films for the Fox and St. Louis theatres, but told Snyder that these could not be used at the Ambassador or Missouri without the approval of the stockholders of the F. & M. Theatres of Missouri. Snyder complained to Arthur that "your activities in the matter of securing films are largely for the benefit of companies other than the two in which I am interested"; and that "there is a possibility of a conflict between your interests in the St. Louis and the Fox and the three theatres held by the Ambassador and Missouri corporations". The only film contracts that continued for the Ambassador and Missouri theatres were the Universal contracts. There were also some negotiations between Snyder and Arthur for consolidation of all of their St. Louis interests [423] in order to operate all five theatres under one holding corporation. However, the parties were never able to agree upon the interests each should have in such a company, and this was never done. Snyder during this same period indicated that he might be a competitor of Arthur in bidding on the Fox theatre lease, after final reorganization of the company that owned this theatre. Arthur and his associates were operating under the temporary lease from the receivers, and were negotiating for a longer lease.

Snyder offered to buy Arthur's interest in the Ambassador and Missouri and sought an option on the basis of $225.00 per share, which was refused. There was also conversation between them about fixing a buy or sell price. Snyder said that Arthur offered him $30,000.00 for his interest near the end of 1934. Defendant assisted Snyder in writing letters to Arthur about these negotiations. The failure to get proper film contracts caused the companies to show an operating loss during 1934. The Dysart Committee had made some concessions on rentals because of this film war, but in January, 1935, threatened forfeiture because a $4,000.00 payment for light, heat and power had not been made. A statement made by Snyder to Dysart showed "a loss for the Ambassador of $47,978.15 and a loss for the Missouri of $47,505.41". These losses included $16,566.25 claimed by Arthur for the 5% management fee which had not been paid. Finances became a serious problem and an assessment on the stockholders was discussed several times as a means for raising money. Defendant wired Arthur about the situation on January 24, 1935, and on the next day wired again saying: "The lid has been blown off. Earnestly advise you leaving tonight for St. Louis". Arthur did come to St. Louis arriving on the 29th and on the next day a meeting of the directors of both theatre companies was held in defendant's office which resulted in

Arthur buying Snyder's interest in both companies for $25,000.00, the amount originally paid by Snyder. The $12,500.00 put up by defendant was repaid to him by Snyder out of the proceeds. Snyder's stock was issued to Transcontinental.

This transaction with Snyder of January 31, 1935, first appeared on the books of Transcontinental on February 7, 1935, as "Snyder interests in St. Louis, $25,000.00". This was transferred to plaintiff's books on November 5, 1935, combined with an item of investment in Eden Theatre Company of $40,000.00, thus: "Investment in affiliated companies St. Louis Ambassador Theatre, Inc., debit $16,666.67, St. Louis Missouri Theatre, Inc., $8,333.33. Account payable Transcontinental credited $65,000.00." Plaintiff's accountant said: "It was later determined that it was not an expense of those companies, but was an expense of Fanchon & Marco, Inc., so it was transferred off those books onto the Fanchon & Marco, Inc., books."

It was early in March, 1934, while the matter of approval of the Dysart Committee's plans for reorganization and leases were still before the court, that Arthur learned about Warner Brothers' declared intention to keep Arthur and his associates in St. Louis from obtaining film contracts. This prevented the proposed new theatre companies from continuing to obtain Warner Brothers or Paramount pictures and it also affected other companies in plaintiff's organization by preventing them from obtaining R-K-O pictures which they had been showing at the Fox and St. Louis theatres. Defendant was in New York on April 7, 1934, and talked to Mr. Schaefer, the head of Paramount, and also Mr. Depinet, President of R-K-O. · He informed them that their action in withholding films from the St. Louis theatres was illegal and would be reported to the United States Department of Justice. At that time he prepared an affidavit to be signed by Arthur and used in connection with a complaint to be filed with the Department of Justice. During April and May, Warner Brothers continued to oppose the reorganization plans of the Dysart Committee in the United States District Court in St. Louis. Arthur was in St. Louis when the foreclosure sale was held on June 7th by which the Dysart Committee obtained title, and it was decided that he should go to Washington and make a complaint to the Department of Justice. Defendant wrote a letter of introduction for him to Assistant Attorney General Schilz which commenced as follows: "This letter will present Mr. Harry Arthur, one of the partners of Fanchon & Marco, who, together with other of my clients, is interested in securing the Ambassador, Missouri, and New Grand Central Theatres in this city. This syndicate desiring to lease the aforesaid theatres has placed $105,000.00 in cash with the Bondholders' Protective [424] Committee." (This was before the theatre corporations were organized.)

The Department of Justice continued to investigate the St. Louis situation during the fall of 1934. During this time, Warner Brothers

made arrangements to open two St. Louis theatres (the Shubert and Orpheum) in order to show the pictures they were keeping away from the Ambassador and Missouri. Defendant's partner, Mr. Walther, went to Washington in September and conferred with Mr. Schilz and Assistant Attorney General Stephens then head of the Anti-Trust Division. Defendant and Snyder also went to Washington in October to confer with Assistant Attorney General Schilz. Mr. Wilkinson, a former member of the firm of Hughes, Schurman and Dwight, which represented plaintiff in New York, had located in Washington and he represented plaintiff in this matter. He and defendant collaborated on preparing affidavits. The matter of suits by the St. Louis theatre companies against Warner Brothers and other film companies was also considered. These complaints resulted in the matter being submitted to the Federal Grand Jury in St. Louis and indictments were returned in January, 1935, against the film companies and officers and an injunction suit against the companies was also filed there by the Attorney General of the United States.

It was at this time that Arthur bought out Snyder. Arthur testified that when he came to St. Louis in response to defendant's telegram, a meeting of the stockholders of the theatre companies was held in defendant's office. Arthur and Snyder could not agree about what was to be done but during the meeting Snyder suggested that if he could get his money back, they could do as they liked about the management of the companies. Arthur said: "I went out into the hall and I asked Mr. Leahy what I was going to do with Snyder. Mr. Leahy told me that he was an obstructionist, a very difficult man to get along with, and that if we could we should buy him out. I told him I didn't know whether I could get the money or not. He said, " 'If you can, I would advise you to get rid of him, because I don't think you will ever get along with him. He has a very suspicious nature and is hard of hearing; he only hears a portion of what goes on, and he suspects the rest.' " Defendant's version of what occurred was as follows: "Arthur came into my office and told me that the situation was intolerable; that he wanted to get rid of this fellow (referring to Mr. Snyder): he said, 'He won't agree to anything and raises so many contentions, and we are in dire need of money and I want to buy his stock.' And I said, 'What will you give him for it?' He said, 'I will give him what he put into it.' I said, 'Let me call in Snyder and see what he has to say about it.' And I called in Snyder and told him what Arthur had to say. . . ." Snyder was not inclined to sell but defendant said to him, "Well, you will either have to go along and get together, work in unison, or you had better sell out. He said, 'How do you feel about it?' and I said 'Thats the way I feel about it.' He then went in to see Koplar and came back and said 'All right, I will sell.' "

Arthur claimed that he never knew of defendant's interest with Snyder until 1939. He said if he had known it he would have gone into the syndicate to obtain the leases anyhow, but would not have allowed Snyder to pay defendant's $10,000.00 in September, 1934, without deducting defendant's proportionate part of the $5,000.00 which Snyder and Koplar had agreed to put up for expenses. Arthur did write a letter stating that they were to pay in this $5,000.00 before paying defendant's fee. However, Snyder testified that Arthur agreed in a telephone conversation that it could be paid when Snyder told him there were sufficient funds on hand. Plaintiff claims that the theatre companies were insolvent when Arthur bought out Snyder. However, it is significant that this deal was made after the Government had begun its cases against the film companies.

Defendant's evidence was that he told his partner Mr. Walther before he went to Washington in September, 1934, that he had an interest with Snyder in the theatres. Walther said he told Koplar about this before he went to Washington. Koplar confirmed this in his testimony, saying: "Mr. Walther was to meet Harry Arthur and Mr. Wilkinson in Washington. I spoke to Arthur practically every day, sometimes twice a day, by long distance telephone, and in one of the conversations I had with Arthur, I told him of the conversation I had—or what Mr. Walther told me. It was shortly after I talked to Mr. Walther. I wouldn't recall exactly what [425] he said, except he said, 'What of it?' because I never thought it made any difference either."

Defendant further testified that when he was in New York in October, 1934, Arthur discussed with him the differences between him and Snyder and his dissatisfaction with Snyder. Arthur said: "You should be able to influence him, as I understand you have a financial interest with him." Defendant said: "Yes, I have a financial interest with him, but I am not able to influence him. He is quite a positive individual and has fixed ideas with respect to paying 5 per cent for management fees, and he is definitely fixed in the idea that he and Koplar are to receive a half interest in these corporations."

Defendant also testified that he and Arthur made a trip together to Mexico, Missouri, in March, 1935, during which trip Arthur asked him to go into a plan with him by which defendant and Mr. Koeln would acquire an interest in a company that would own all five of the theatres in St. Louis. Defendant said that Arthur referred to his interest with Snyder saying: "You had an interest in the picture business, and you haven't lost anything so far"; and "that the conditions that arose at the time that the syndicate was formed to take over these theatres were the most difficult he had ever experienced in business and that if it hadn't been for that fact 'you and Mr. Snyder would have both made money.'"

Arthur denied that these conversations ever took place but admitted that Koplar had told him "that he suspected that Leahy had an interest with Snyder." He said that Koplar made this statement in connection with a tirade in which he complained bitterly about Walther and Leahy getting from him some of the bonds guaranteed by the Skouras Brothers, and holding them for an attorney fee. Arthur said in his testimony: "I think I had one or two suspicions that there might be something to it, but not sufficiently strong for me to go to Leahy to ask him if such and such was the case. I had no idea that there was anything I could do about it, even if it was true. . . . If it had made any difference to me, I think I should have asked him. . . . It didn't make any impression on my mind. In fact, I thought it was just one of Koplar's tirades." Further reference to Arthur's knowledge of defendant's interest will be made in connection with the facts set out in Part II of this statement.

II. *Events of Second Period—February, 1935, to December, 1936, Inclusive.*

Immediately after the purchase of Snyder's interest, a 5% management contract was entered into between F. & M. Stage Shows, Inc., and the two St. Louis theatres. During February and March, 1935, defendant and Arthur corresponded about Fox Theatre matters and about Snyder's stated intention to be a bidder for the Fox properties. They corresponded further about the film situation in St. Louis and the cases commenced by the Federal Government. There was also correspondence concerning negotiations through which Arthur was attempting to buy an interest in the St. Louis Amusement Company, which operated a large number of neighborhood theatres in St. Louis, and was in receivership. This was another Skouras enterprise.

The matter of bringing suit against the Skouras Brothers as guarantors of the bonds secured by mortgages on the theatre buildings was further discussed. There was a considerable amount due on these bonds as a result of a deficiency between the amount of the bid at foreclosure sale by the Dysart Committee and the face amount of the bonds. One purpose of this proposed suit was to influence them to call off the film war.

On April 4, 1935, defendant wrote Arthur the terms upon which he would bring suit against both the film companies and the bond guarantors. This was as follows: "I am writing in accordance with your request to state the amount we will charge for professional services for the St. Louis Missouri Theatre, Inc., and the St. Louis Ambassador Theatre, Inc., which will be Ten Thousand Dollars ($10,000.00) in cash and a contract with both of the corporations for twenty per cent (20%) of any amount recovered, either after litigation or through compromise with the Warner Brothers, R-K-O and Paramount Film Companies, incident to their preventing the said

corporations from securing film for exhibit in St. Louis. All out of pocket expenses to which we may be put or costs incident to any litigation will be borne by the corporations. These services on this basis will include all matters now on our books.

 "With respect to contemplated suits against the guarantors of certain bonds issued by the Central Properties Corporation and the St. Louis Properties Corporation, we will charge for professional services twenty per cent (20%) of any amount we may recover, you to bear all out of pocket expenses and court costs, the twenty per cent contract to include either recovery by suit or by way of compromise or otherwise."

Thereafter on April 13, defendant wrote Arthur concerning what was necessary to be done in connection with the government's cases against the film companies, and suggesting information that should be furnished. This letter concluded as follows: "It appears to me that you, for reasons of your own, do not follow my advice. I am placed in the position where I am fearful your lease for the Ambassador and New Grand Central may be cancelled and solely because you have not signed the contract incident to the arrangement I made to allow 50% of the rent on the two leases to be paid in cash and the balance to be paid in notes maturing after September 9th. You approved this arrangement and why you do not sign the contract, after our many talks on the subject, particularly my telephone with you on Thursday night, is to me inexplicable. I think that you should immediately determine whether you desire our firm to represent you in the matters set forth in the letter you requested me to write. If not, we are prepared to withdraw from all of your matters upon the receipt of a check for $10,000.00, and our various outlays incident to your matters."

Arthur's letter of acceptance of the terms stated in defendant's letter of April 4th was dated April 17th and was as follows:

"We hereby accept your offer for professional services for the St. Louis Missouri Theatre, Inc., and the St. Louis Ambassador Theatre, Inc., as outlined in your letter of April 4, 1935.

Very truly yours,

St. Louis Missouri Theatre, Inc.,

By H. C. Arthur, Jr., President

St. Louis Ambassador Theatre, Inc.,

By H. C. Arthur, Jr., President."

On April 20th Arthur sent defendant bonds of the face value of $18,000.00 for this purpose. Arthur and his associates had more of these bonds, the exact amount of which is not shown and defendant's law firm also had some of them, which they had received from Koplar in payment of fees. Suit on these bonds was delayed awaiting receipt of the rest of these bonds which were not sent because of the hopes of obtaining a settlement of all matters as the result of trials of the

Government cases. After making this contract, an account was entered upon the books of the Ambassador described as follows: ''An account called 'Accrued Legal and Professional' dated April 4, 1935. Two-thirds Leahy, Saunders & Walther, journal 15, a debit of $6,666.66 accrued legal and professional, credited $6,666.66 to set up credit of $10,000.00, two-thirds Ambassador and New Grand Central, and one-third Missouri. Contingent liability of 20 per cent of damages, if case is won.''

There was a similar entry on the Missouri books, as follows: ''Journal 12, Accrued Legal and Professional Debit $3,333.34, Leahy, Saunders & Walther credit $3,333.34 to set up one-third accrued and legal fees, per H. Arthur.''

Arthur said he signed the contract because defendant was their contact with the Department of Justice and had initiated the suit by the government. (Defendant had previously cooperated with the Department in other litigation.) He testified ''we would have been hamstrung if we hadn't signed that; if Leahy had walked out of the case at that time, I don't know what would have happened, because he was very friendly to all these people in the Department of Justice, and knew Mr. Hardy and Mr. Schilz personally; they were following to a great extent Leahy's advice; we would have been sitting out on a limb.''

The trials of the criminal cases against the film companies began about the last of September, 1935, and resulted in a verdict of acquittal of defendants on November 10, 1935. Trial of the injunction suit was thereafter commenced but it was dismissed after a partial hearing. The Government immediately instituted a new equity suit of the same kind with additional defendants in the Southern District of New York in January, 1936. During the trials in St. Louis, in the fall of 1935, Mr. Wilkinson came to St. Louis, as attorney for plaintiff, to assist the Attorney General. Mr. Chasnoff of St. Louis likewise represented Eden and other corporations in which plaintiff was interested, while defendant and his firm represented the Ambassador and Missouri companies.

Because of the pending suits by the United States Government, no suit was then commenced on behalf of the theatre corporations against the film companies as contemplated in the contract of April, 1935. It was decided that it would be best to wait until the termination of the Government litigation because, if it were successful in establishing violation of the anti-trust laws, the theatre companies could then bring suit for triple damages.

After the termination of the suit in St. Louis, since the Government has commenced another suit in New York, it was decided to await the outcome of that suit. The possibility of state anti-trust proceedings was also discussed but both defendant and Arthur advised against this. In the latter part of March, 1936, Wolff became impatient about

the progress of the Government cases and came to St. Louis to consult defendant about having the State of Missouri commence anti-trust suits at once. Wolff brought his personal attorney, Mr. Goldstone, from Los Angeles to assist in this matter. They considered state action to be necessary and urgent. It was decided to employ other Missouri counsel to assist in this matter and arrangements were made to employ Mr. James P. Aylward of Kansas City. Defendant obtained the approval of the state proceedings by United States Assistant Attorney General Hardy. Defendant and Goldstone then went to Kansas City and met Aylward on April 6th. Aylward suggested a retainer of $5,000.00 and testified that Goldstone said that if Aylward could accomplish what they expected a fee of $50,000.00 would not be out of line.

The next day defendant, Goldstone, Aylward and Aylward's associate, Mr. O'Brien, went to Jefferson City. They were met there by defendant's partner, Mr. Walther who brought with him the records of trials of the Government cases. Defendant, Aylward and Goldstone had a conference with Attorney General McKittrick. The Attorney General stated that similar complaints of violations of the anti-trust laws by film companies had come to him from Kansas City and other places in Missouri, and he assigned his assistant, Mr. Hoffman, to cooperate with the other attorneys in investigating and preparing the cases. This was done throughout the rest of the week and on Sunday, April 12th, the parties returned to Jefferson City. On that day, Wolff talked to Arthur by telephone in New York and was informed that he had an appointment with Mr. Rosenblatt, a former N. R. A. director of the film industry to negotiate with representatives of the film companies to discuss settlement. Wolff told defendant about this conversation but said that Arthur had no great confidence in the results of such negotiations. On Monday, April 13th, defendant, Goldstone and O'Brien worked all day in the office of the Attorney General, preparing final drafts for a quo warranto suit to be filed in the Missouri Supreme Court and equity suit to be filed in the Circuit Court of St. Louis. Wolff said he had several telephone conversations with Arthur during that day, and at noon told defendant that Arthur reported that the settlement was becoming serious. According to Wolff, later that afternoon Arthur told him that an actual agreement for settlement had been reached and that all litigation had to be called off and that the state suit must not be filed. Wolff said he reported this to defendant, but defendant told him that the film people were just fooling them again, that they had done it before, that they could not depend on their promises and they should not pay any attention to them but should go ahead with the state suit. Wolff testified that he finally prevailed upon defendant as to the finality of Arthur's statement and agreed "that he would not file the state suit." Wolff

went back to St. Louis that night but Goldstone remained in Jefferson City with defendant.

Defendant testified that Wolff told him about the conversations Arthur was having with the film companies but said nothing to him in Jefferson City about preventing the filing of the suits. He said that Wolff and Goldstone were disturbed because the Attorney General contemplated making certain other film companies defendants because of the Kansas City complaints. These companies were friendly to Wolff and he did not want any suits brought if they were included. Defendant was finally able to persuade him to leave them out, and proceed only with reference to the St. Louis situation. O'Brien testified that everything that was said by those present at that time was directed toward pushing the cases to completion, and that no one suggested to him that they be delayed. The Attorney General also testified that Goldstone told him that it was necessary that the state take some action [428] to protect his clients under the anti-trust laws, that this was the only way they had of protecting themselves and wanted them to hurry up about bringing such suits. He said it was his understanding that "if the negotiators, whoever they were, understood that the state meant business, that it might have some effect of bringing about a condition that would eliminate the very cause of action." He also said that no one informed him before his suits were filed that the controversy had been settled and if it had been settled he would not have filed the suits. He further testified that there were protests against dismissal of the cases after the settlement of the Government case and said: "When you wanted the cases dismissed, I really wanted to try them", but finally decided that "if the Government is satisfied, I should probably follow what the Government does."

The next evening, April 14th, defendant, Wolff, Goldstone and Hoffman had dinner at the University Club in St. Louis. Hoffman had brought the papers with him to file in St. Louis the next morning when the other suit was to be filed in Jefferson City. Wolff said that he told defendant that he had another conversation with Arthur during that day and was told that the Warner representatives had reached Harry Warner in Wales by transatlantic telephone and that the consummation of the deal was a fact, and that the most important part of the deal was to see that no further litigation was started. He testified defendant said that "you couldn't use the sovereign State of Missouri as a collection agency"; that "your partner can't tell me to go ahead with something, then tell me to stop; and that the sovereign State of Missouri cannot be toyed with." He also testified that defendant said it was a State matter, not a private matter, and that it had gone beyond the realm of private individuals, but finally agreed to see Assistant Attorney General Miller in St. Louis the next morning and endeavor to stop the action, if it could be stopped. Defendant said that he told Wolff that the State was not coming into the

matter just to serve them, but because the State thought there had been a violation of the law, that having put in a number of days convincing the State officials that there had been a violation of the law, and that it was the duty of the Attorney General to proceed and if they now showed a desire to delay, the Attorney General might think they were not as serious as they claimed. He said Hoffman agreed to call the Attorney General before filing the equity case, and on the next afternoon told him that he had done so but that the Attorney General instructed him to file it and that he had filed it. Defendant also said that Wolff and Goldstone were in his office on April 15th before they left St. Louis that afternoon for New York and told him that they had heard from Arthur again and that he wanted them to proceed in the matter. He also said he talked to Arthur by phone that night and, after hearing his report of what had taken place, Arthur told him he thought it would be poor policy to dismiss them, and said that "the bringing, or the threat to bring these suits by the State of Missouri had a great influence on those parties." Defendant also said that Arthur did not then say that any papers had been signed, but "said he was still in communication with those people through Mr. Rosenblatt." Arthur denied that he made this telephone call but did say that defendant reported to him what they were doing and he did not ever tell him to stop the filing of the suit. Mr. Goldstone was not produced as a witness.

Wolff produced a memorandum which he said defendant gave him to take to Arthur when he left St. Louis on April 15th, which was as follows: "After Arthur requested delay in filing of injunction suit and after Attorney General agreed to delay until we were ready, the Attorney-General sent word to his assistant to file the case immediately. We, under the circumstances, took no part. Restraining order issued returnable April 30th."

The preliminary papers for the settlement with the film companies was written on April 14th. Acceptances of these agreements were endorsed thereon but were not dated. Arthur said they were signed about midnight on April 14th. However, it was admitted that Paramount and R-K-O did not sign at that time. The supplemental agreements providing for matters not covered in the first draft was made on April 28th. These were made subject to the approval of the Department of Justice. These papers were all in the form of letters written by Rosenblatt to the companies interested, stating the items as to which agreement was required. A stipulation for this settlement on the terms stated in the letters was then prepared (dated April 30, 1936) and was filed [429] in the United States District Court on that date; and pursuant thereto the equity suit of the United States Government was then dismissed.

. On April 17th, Arthur talked by telephone to defendant and Aylward, who was then in defendant's office in St. Louis, and was re-

minded that Aylward's $5,000.00 retainer fee had not been paid. Aylward said that Arthur did not then tell him that he wanted the state suit dismissed, but said he was still carrying on negotiations, and "urged us to prosecute the case with great vigor and dispatch." Arthur said he thought he spoke to Aylward about the necessity of calling off the suit. However, defendant said that Aylward told him that he would withdraw from the case if the clients did not intend to pay the retainer fee and that, when he reported this to Arthur, he said he would arrange for immediate payment in St. Louis and asked him not to permit Aylward to withdraw from the cases. Defendant also said that Arthur asked him to bring Aylward to New York to discuss his final fee, but Aylward could not go because of court appointments, and it was agreed that he and Arthur would confer when he came out from New York. Aylward's $5,000.00 retainer fee was paid on April 17th. Arthur wrote Aylward on April 27th: "I have been having some negotiations, which you know about, which have delayed my departure."

Defendant did go to New York during the latter part of April to try a case there and saw Arthur about the settlement. Arthur said he took umbrage at the fact that they made the settlement without him; said that they could not make a settlement without taking care of him and said that under his contract he owned 20% of the business. Arthur said he told defendant he could have 20% of what they had in St. Louis if he would pay 20% of what they had invested in St. Louis and 20% of what they were paying Warner Brothers. They finally agreed that defendant and his firm should be paid $75,000.00. Arthur, however, said he only agreed to pay $10,000.00 of this in cash, and the balance at $200.00 a week. Defendant said that no deferred payments were even mentioned at that time. However, there was never any further argument about the total amount to be paid. Defendant claims that at this time and in connection with this agreement his firm was for the first time employed by plaintiff. Defendant's firm did render considerable service during the rest of that year both for plaintiff and its subsidiaries in carrying out the necessary steps to complete the settlement with the film companies. Mr. Walther went to New York to assist in doing this. Among the things he did were preparation of the new contracts with the bondholders committee, obtaining releases from various individuals and corporations ("everybody that had any possibility of ever bringing suit against Warner Brothers had to sign the releases they demanded") and organizing two new Missouri corporations, as subsidiaries of plaintiff, called Fanchon and Marco Enterprises, Inc., and Fanchon and Marco Service Corporation, which are the other two plaintiffs in this suit. The settlement was not to be effective until all papers and releases were signed and this was not completed until July.

Arthur came to Missouri in May and he and defendant met Aylward in Jefferson City on May 9th. Aylward testified about this meeting as follows: "I suggested he pay an additional fee of $30,000.00 full and final fee in the matter, and he said, 'In my judgment, the fee is not out of line, it is reasonable, but I have paid you $5,000.00 retainer; if you will include that I will pay you an additional $25,000.00', and we agreed on the fee of $25,000.00 additional." (Plaintiff also claimed that defendant stated that he could fix Aylward's fee at only $5,000.00 more and failed to do so.) The agreement was that this fee was to be paid in one, two and three years in equal installments. Arthur said that defendant and Aylward both told him that the State suits could not be dismissed until the fee promised by Wolff's lawyers had been paid. Both Aylward and defendant denied that any such statement was made. $11,666.67 had been paid Aylward on these deferred payments at the time this case was tried.

It appears that the Dysart Committee opposed the dismissal of the state and federal anti-trust cases and sought to have them reinstated, apparently because of their own claims against the film companies. There were also other exhibitors (especially representatives of negro theatres) who opposed the dismissal of the state cases. Under the settlement Warner Brothers sold out all of their St. Louis interests to plaintiff and gave them ten year franchises on films. Similar franchises were also given plaintiff by the other film companies involved. [430] This gave plaintiff control of seven of the eight first run picture theatres in St. Louis. It also included the interest of Warner Brothers in the St. Louis Amusement Company which operated a large number of second and third run theatres throughout the city. Plaintiff agreed to pay Warner Brothers $385,000.00 over a period of ten years for these interests. Because of the additional St. Louis properties obtained by plaintiff under the settlement, Arthur moved his headquarters to St. Louis in September, 1936.

Arthur and defendant began negotiations for settlement of the $75,000.00 attorney fee on December 3, 1936. Defendant said the matter of installment payments had never been mentioned until that day. Arthur said it was mentioned when the amount was fixed in April. On December 3rd Arthur came to defendant's office and paid him $10,000.00 and received $8,000.00 in Central Properties bonds, guaranteed by Skouras, which defendant had received in payment of a fee from Koplar. Arthur did not want Skouras sued on these bonds because of the settlement. Defendant and Koplar both testified that Koplar was present but Arthur claimed that he was not. Prior to this date Arthur had a conversation with Snyder in which he asked him if defendant was interested with him in his original stock. Snyder told him that he never knew whether the money defendant furnished was his own money or the money of others. He also said at the trial that he knew part of it was furnished by Lamy. Snyder

said this conversation was in June, 1936, while Arthur said it was as late as November. On another occasion Snyder said Arthur asked him what he did with the $25,000.00 he paid him and he told him he only got half of it.

There was considerable argument between defendant and Arthur about the deferred payments. Defendant and his partner, Mr. Walther, wanted interest and Arthur refused to give interest. Arthur wanted to give notes of the Ambassador and Missouri, but defendant insisted on notes of plaintiff endorsed by two new Missouri subsidiaries. Defendant said Arthur stated that defendant got back his money that he put into the theatres and that these payments would be profit. After arguing throughout December, they finally compromised on notes without interest given by plaintiff, endorsed by the two subsidiary corporations. Plaintiff paid the deferred notes weekly throughout 1937 and 1938. In December, 1938, plaintiff required refinancing and sought to have the notes extended. There were negotiations about this refinancing throughout the early months of 1939. Arthur claimed that he first learned that defendant had been interested with Snyder on March 22, 1939. He said that he asked defendant about it on that date and defendant then admitted it. Some more of the notes were paid after that date. A payment of others was tendered on April 27th, in a letter which stated: "Payment of these notes, however, is expressly made with a reservation of all rights that Fanchon and Marco, Inc., and its subsidiaries have against the firm of Leahy, Saunders & Walther and any of the individual members thereof by reason of nondisclosure of material facts by your firm which we believe should have been disclosed." This payment was refused and this suit was started in July, 1939. In the meantime defendant began suits on some of the notes before a Justice of the Peace.

The Attorneys fees incurred in connection with the film war settlement were charged as expenses of plaintiff, and entered on its books on December 31, 1936. The $5,000.00 payment made to Mr. Aylward in April, 1936, was made by check of the Ambassador and prorated between it and the Missouri. ($3,333.33 and $1,666.67.) The remaining $25,000.00 due Aylward and all of the $75,000.00 for fees paid to or due defendants under the settlement, together with fees to other attorneys, making a total of $170,000.00 (Moyle and Wilkinson, $30,000.00; Rosenblatt $25,000.00; Hughes, Schurman and Dwight, $10,000.00; Goldstone $5,000.00), were all charged on plaintiff's books (December 31, 1936) and deducted as expense on plaintiff's income tax return for the year 1936. However, the $10,000.00 payment made to defendants on December 3rd, 1936, was by check of the Eden Theatre Company. Further material facts will be mentioned later in the opinion.

### III. Conclusions Concerning Period of Oral Contract.

While we defer to the findings of the trial Chancellor on disputed fact issues decided upon oral evidence, we do not have a clear case for doing so here because the decree in this case made no findings of fact and discloses little as to the views of the Chancellor concerning the controlling issues. Apparently, it operates solely upon settlement of December, 1936, [431] by ordering all outstanding unpaid notes given defendant at that time "annulled, cancelled and declared void"; and by giving judgment for plaintiff only for the sum of $32,200.00 paid to defendant under that settlement either in cash at that time or thereafter applied on notes then given. (Giving credit for the value, as determined by the court, of the Central Properties bonds then received by plaintiffs.) There is no judgment in the decree in favor of plaintiff for the $10,000.00, for which it also sued, for the fee paid defendant on September 27, 1934, for obtaining the theatre leases and organizing the theatre corporations. Since the court allowed defendant to keep this fee, we must consider that the court found that defendant was entitled to this fee. This could only be done on the theory that the relationship of attorney and client did not exist between plaintiff and defendant during the oral contract period, or that, whether it did exist or not, Arthur knew of defendant's interest with Snyder either during that period or prior to the making of the contract for settlement of attorney fees in December, 1936. Obviously it would be a completely inconsistent and self destructive result to say that defendant was not entitled to the $75,000.00 fee earned under the written contract of April, 1935, because he was guilty of misconduct due to nondisclosure of personal interest during 1934 when he was working for plaintiff under an oral contract, and at the same time say that defendant was entitled to the fee paid him in 1934 for the very work in which the misconduct took place. We cannot assume that the court reached any such contradictory result, but must consider that it found in defendant's favor concerning his 1934 fee for one reason or the other. The rule of deference, therefore, works mainly against plaintiff in this case.

Furthermore, a careful consideration of the entire record in this case causes us to reach the conclusion that the claim of misconduct based on nondisclosure of interest in 1934 was an afterthought raised in 1939 only when payment of the balance of the $75,000.00 fee had become burdensome because of changed financial conditions. The evidence convinces us that Arthur knew about this interest at least before he made the settlement in December, 1936. According to his own testimony he did hear about it from Koplar. He would not attempt to fix the date when he heard it, but Koplar testified that it was before he bought out Snyder. Arthur said he didn't believe it then, but nevertheless said he had continuing suspicions about it, and he admitted that he enquired of Snyder about it sometime in 1936. Moreover, Koplar was Arthur's close associate, at first manager of

his theatre and later the man authorized to make decisions for him in St. Louis concerning the management of all his business when he was out of town. He did also know that defendant had originally interested Snyder in the deal and that they were personal friends. Snyder wrote Arthur on one occasion that he must consult defendant as a personal friend, as well as a lawyer, before he would make a decision as to one controverted matter. It was also shown that defendant was financially interested with Snyder in a corporation which manufactured small storage batteries for use in hearing devices, and that defendant served on the board of directors of this company. It is inconceivable that Arthur did not know something about this. In view of the amount of time Arthur spent in St. Louis and the many contacts he had with Snyder and defendant, it seems unreasonable to believe that he would not have raised this question prior to the settlement of December, 1936, if it had made any difference to him.

Considering the situation in its entirety, it becomes apparent why it would not have made any difference at least so far as plaintiff was concerned. This was because Arthur did not employ defendant as an attorney for plaintiff, but personally went into the syndicate to obtain the theatre leases with the understanding that defendant was to be the attorney for the lessee corporations and that his agreed fee of $10,000.00 was to be a debt of these corporations. There was no evidence to show that plaintiff was liable for it or had any intention of paying it. This is not a case in which an attorney was employed by a main or parent corporation and was expected to look after the affairs of its subsidiaries. Plaintiff operated at all times far in the background behind a screen of subsidiary corporations. It was not even contemplated that these St. Louis theatre corporations which were to be formed would rise to the dignity of being such subsidiaries. They were to be another step lower in the scale, as affiliated corporations in which plaintiff or one of its subsidiaries would own only a part interest. Defendant was attorney [432] for the syndicate of individuals promoting these corporations who intended him to be the attorney for these corporations if he were successful in getting the leases for them. Of course, Wolff and Arthur intended that they or some other individual or corporation later designated by them should be stockholders in the theatre corporations. They also intended that some company, in which they were interested, should get the management contract to operate these theatres. As it turned out, it was Transcontinental instead of plaintiff to which the stock for this interest was issued. Likewise, the 5% management contract for which Arthur contended was not for plaintiff but for F. & M. Stage Shows. Arthur's letters to defendant during this period were written on the stationery of F. & M. Stage Shows, Inc. In fact, there seems to have been a studied effort on his part to keep plaintiff's business outside the scope of his dealings with defendant.

■ Since the adoption of the original opinion herein, plaintiff has filed a motion for rehearing and has (in its suggestions in support) somewhat changed its position to take a similar view of this part of the transaction. We have, therefore, rewritten this portion (Part III) of this opinion. Plaintiff's suggestions say that "the fee of $10,000.00 which was paid to Leahy by the St. Louis Ambassador Theatre, Inc., on September 17, 1934, . . . was not paid by Fanchon & Marco or for its account"; that "it was paid at a time when Snyder and Koplar had a 50 per cent in the company which paid the fee"; that "the consideration for the $10,000.00 fee was Leahy's work in obtaining the leases and organizing the two local companies to take title to them, and to operate the theatres"; and that "Leahy's services for the $10,000.00 fee which he received on September 17, 1934, ended when the two leases were obtained and the two local companies were organized." We think this view of the formation of the syndicate is correct. Thus it seems clear that prior to the organization of the theatre corporations, for which defendant was paid the $10,000.00 fee, he was not employed as plaintiff's attorney as alleged in plaintiff's petition.

Plaintiff, however, says, in its suggestions: "Thereafter Leahy rendered continuous services for Fanchon & Marco. He served them (so Arthur thought) in the deadly struggle with Snyder. He served them in the negotiations to sell and the sale of Snyder's stock to them. He had initiated the groundwork for the anti-trust prosecution as early as April, 1934. He had done work on the proposed suit against Skouras Brothers on the guarantee. He had been consulted about many ramifications of the business of Fanchon & Marco. All of these services had been performed before the contract of April, 1935, was made and related to subject matters different and apart from the subject matter of that contract."

But when was defendant employed by plaintiff to be its attorney? What basis is there in the evidence to find that, upon the successful conclusion of and attainment of the results for which the syndicate was formed, defendant then became the attorney for plaintiff? The services relied upon to establish this relation consisted almost entirely of presenting to the Department of Justice the matter of anti-trust law violations by the film companies which would ruin the new St. Louis theatre companies if they could not be stopped. Of course, defendant cooperated with Arthur (whether Arthur was acting as president of the local companies or for plaintiff or some of the group of corporations in which it was interested) to interest the Department of Justice in the St. Louis film war. He had every reason to do so as attorney for these St. Louis theatre corporations. Likewise, he was properly engaged in it as attorney for the receivers of the Fox Theatre, whose interests were also affected. It is apparent that these receivers were interested in cooperating with all others whose interests were

involved. They were temporarily renting their theatre to Arthur acting for Eden. It appears also that they were informed of the activities and objectives of the original syndicate. One of the receivers, Mr. Koeln, personally handled the money of the syndicate (to make the required deposit on the leases) through his bank. No doubt, there was reason to believe that such a reorganization would be helpful to stabilize the whole St. Louis theatre situation. Plaintiff or some of its officers or subsidiaries were interested in that matter as prospective stockholders of the new theatres. But it must also be remembered that Wolff and Arthur had other interests, even in St. Louis, which were affected thereby; and it is significant that they employed other attorneys to represent them throughout all these proceedings when [433] the controversy touched their separate interests there or elsewhere.

We think that the whole course of dealings between the parties after incorporation shows that defendant was acting solely as attorney for the new theatre corporations, and only cooperating with plaintiff and other parts of its organization, in interesting the Department of Justice in what the film companies were doing to monopolize the St. Louis field. This is shown by the fact that when it came to actually writing a contract, for defendant's services, it was not signed by plaintiff. Defendant's letter did not even propose a contract with plaintiff. Arthur seemed to be very careful to sign it for and as president of the two local theatre corporations only. Moreover, none of defendant's fees or reimbursement for expenses ever came for plaintiff. All were paid by checks of local theatre corporations. It is true that after the settlement with the film companies in May, 1936, defendant and Mr. Walther were asked to and did do much of the legal work thereafter necessary for plaintiff to comply with the settlement, which it had made with the film companies, and through which it had acquired additional St. Louis theatres by purchase from the Warner interests. Plaintiff did then assume the obligation for a $75,000.00 fee, which it agreed to pay defendant at that time, both to take up his contract with the local companies and to pay for the work yet to be done for plaintiff to complete the film war settlement. The December, 1936, contract for payment of defendant's fees specifically so states. But that was after plaintiff had taken over almost the whole St. Louis field (owning every large theatre except Loew's) through the deal with Warner, under the settlement, and the Ambassador and Missouri were to become its wholly owned subsidiaries.

Furthermore, when defendant and Arthur were arguing about the deferred payments in December, 1936, and defendant suggested his rights under the 20% feature of his written contract, Arthur wrote that it would be "perfectly satisfactory with us" if defendant wished to repudiate the contract for $75,000.00 and "have settlement made exactly in accordance with your contract with the corporations with

whom it is signed''; but that defendant would first have to return the $10,000.00 paid him on December 3rd because "it was not paid on account of the contract you have with the St. Louis Ambassador Theatre, Inc., or St. Louis Missouri Theatre, Inc. Fanchon & Marco paid this money and they should not under any circumstances pay it on behalf of these two corporations unless it was.in accordance with that agreement for settlement of all the work that has been done by your firm''. We do not think that this situation shows an attorney and client relation between plaintiff and defendant prior to plaintiff's settlement with the film companies.

Plaintiff cites cases where an attorney without disclosure represented conflicting adverse interests in a suit or entered into a conspiracy to defraud his client. (In re Conrad, 340 Mo. 582, 105 S. W. (2d) 1; Moffett Bros. Partnership Estate v. Moffett, 345 Mo. 741, 137 S. W. (2d) 507; In re Thomasson's Estate, 347 Mo. 748, 148 S. W. (2d) 757; Laughlin v. Boatmen's National Bank (Mo. Sup.), 163 S. W. (2d) 761; Fiske v. Buder (U. S. C. C. A.), 125 Fed. (2d) 841.) These cases present a very different state of facts. Plaintiff makes much of the situation existing during the time of the arguments between Snyder and Arthur. However, defendant was under no obligation to take Arthur's side of those controversies if he were only attorney for the theatre corporations. An attorney for a corporation is not necessarily the personal attorney for all of its stockholders individually, who are likely to have conflicting interests among themselves. Certainly not for merely prospective stockholders who may or may not be determined to become such in the future. Whatever isolated statements in this voluminous record may indicate when segregated from their context and background, considering the whole course of dealings between the parties, it seems clear that defendant in rendering these services was acting as attorney for the local corporations, and not for plaintiff or even for Arthur or Wolff personally. The fact stands out that when the contract for these services was put in writing the only parties bound thereon to pay for such services were the two theatre corporations, with Arthur signing only as president of these corporations and only for them. For these reasons and for the reason that we think the record shows Arthur's knowledge of defendant's interest with Snyder at least prior to the December, 1936, settlement, we hold that the court properly denied recovery for the $10,000.00 paid to defendant in 1934.

IV. *Conclusions Concerning Period of Written Contract.*

This leaves the issue of whether the relief granted for cancellation of the notes for and recovery of the payments on the $75,-000.00 fee was warranted because of alleged misconduct in connection with the state anti-trust suits. As we pointed out, the court could not have found against defendants' right to these fees on the

theory of misconduct in wrongful concealment of an inconsistent personal interest because it refused to allow recovery for the $10,000.00 fee earned and paid during that period. We have also stated our conclusion from the whole record that Arthur knew of this interest at least before the settlement of December, 1936. We will, therefore, consider the facts shown concerning the state anti-trust cases.

At the outset, it must be remembered that both Arthur and defendant advised against stirring up any state action while the federal suit was pending. Mr. Wolff was not satisfied with this advice and brought his personal attorney, Mr. Goldstone, from Los Angeles to get state action started. Defendant then got the approval of representatives of the Department of Justice before urging the Attorney General of Missouri to begin any state action. Also defendant did not feel that he should undertake to proceed in such a matter alone. Wolff was very anxious to obtain prompt action and approved the employment of Mr. Aylward for that purpose. His personal attorney was said by both Aylward and defendant to have told Aylward (and no one denied that he did so or was authorized to do so) that it would be worth $50,000.00 to his clients.

Mr. Aylward and his associate, Mr. O'Brien, met and conferred with defendant, Mr. Walther and Mr. Goldstone in Jefferson City and presented the matter to the Attorney General. They found that he had other similar complaints and were able to persuade him to bring state action, by quo warranto and an action in equity. The attorneys went home and put in the week preparing these cases as requested by the Attorney General. They came back to Jefferson City on the next Monday with the papers prepared. The Attorney General desired to include as defendants other film companies against whom complaint had been made in Kansas City. Mr. Goldstone insisted that he should not include these companies, which were friendly to Mr. Wolff's interests, and he was finally persuaded to leave them out. After having the Attorney General convinced of the necessity of going ahead with these suits, Mr. Wolff claims that on Monday he insisted that these actions be not commenced because he had heard from Arthur that a settlement of the federal case had been agreed upon. However, Arthur's testimony shows that no settlement proposition was actually signed until about midnight Tuesday night. It was not signed then by R-K-O and Paramount and there is nothing in the record to show that they signed anything before April 30th. Anyhow, it was after Assistant Attorney General Hoffman had come to St. Louis, with a petition prepared for filing the next morning, before anyone signed even the preliminary agreement. Defendant, Wolff, Goldstone, Hoffman and United States Assistant Attorney General Hardy were all together on Tuesday evening. Wolff did want the matter delayed then because it seemed that a settlement would be made. However, Hoffman was present to hear what was

said; and he agreed to take up with the Attorney General the next morning the matter of delaying filing the suit. He did so, but was instructed to file it.

It is understandable why defendant would hesitate and also be disturbed about the matter of attempting to stop the suits, after they had been insisted upon against his advice and after he had put in so much time convincing the Attorney General that the state laws had been violated. Defendant knew that state action for law violations could not be turned on and off like a water faucet, which was apparently Wolff's idea. It is significant that when the cases were dismissed there were protests from others, including the Dysart Committee and attorneys for other exhibitors who were having trouble with film companies. It seems reasonable that the imminence of state action aided in bringing about the negotiations for settlement. It also appears that Arthur at least did not insist on getting the cases dismissed before the final settlement and decree in the federal case, because he urged that Aylward be kept in the case and paid him his $5,000.00 retainer fee several days after the preliminary settlement papers had been signed. The final settlement with the film companies was certainly not prejudiced by the filing of the state suits because the federal case was promptly dismissed. [435] Likewise, the state suits were dismissed pursuant to the agreement of settlement.

Plaintiff's complaint boils down to the claim that it was prejudiced because it had to pay Aylward $25,000.00 more. However, this was less than Mr. Goldstone told Aylward the result would be worth and Arthur did not even argue with Aylward about the size of the fee at the time, except to get credit, on the final amount named, for the $5,000.00 retainer. Defendant may have erred in his judgment about the best way to handle the matter after the settlement negotiations began, but we find no evidence of misconduct which should deprive him of his fee which was agreed upon as to amount in New York the very next week. Here is a good example of the old adage that actions may speak louder than words. The events of Jefferson City were then fresh in Arthur's mind because Wolff had gone directly to New York to see him after the state suits were filed. The fact that the agreement as to final fees was made at that time, with also the immediate further employment of defendant's firm to do all the necessary work required to carry out plaintiff's part of the settlement, does not indicate disapproval then of defendant's conduct.

The whole idea of anti-trust action originated with defendant and his vigorous efforts were in a great measure responsible for the final successful result and beneficial settlement which gave plaintiff and its subsidiaries practically the whole St. Louis field. (Of course, paying a lawyer after the case is won, like paying a physician after the patient gets well, does not always seem quite so important as the need for his services before the outcome is in view.) That plaintiff and its

officers were very well satisfied with the results of the settlement is shown by the fact that when, after the settlement, Snyder sought to buy back into the two local theatre corporations at the price for which he sold his stock plus a proportionate share of the loss thereafter sustained (claiming that he had such an agreement to buy back). Arthur refused to consider the proposition and stated that it was very unfair to make any such claim at a time when the situation had become so much more favorable. Thereafter, Arthur did make an offer to sell Snyder a one-sixth interest in all the St. Louis properties at the price of a quarter of a million dollars. Plaintiff makes the further claim that the evidence showed other improper conduct of defendant by reason of Snyder and defendant dividing the commission of the loan made in connection with the Fox Theatre reorganization. However, this was not within the pleaded issues and, moreover, it appears that this loan was made to the reorganized Theatre Realty Company which was the owner of the building, and not to plaintiff. One of plaintiff's subsidiaries was the lessee of this theatre but no interest in the company which owned the building was disclosed. Our conclusion is that plaintiff has not shown that the equities of the situation entitle it to the relief sought.

The decree is reversed and the cause remanded with directions to dismiss plaintiff's bill. All concur.