**LUMBERMENS MUTUAL CASUALTY COMPANY and Reliance Insurance Company, Appellants,**

v.

**Grant THORNTON, John R. Gunter, Bruce E. Moore, Lawrence Redler, Kent Gedman, and Grant Thornton, L.L.P., Respondents.**

No. WD 60134.

Missouri Court of Appeals, Western District.

Nov. 19, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Dec. 24, 2002.

Application for Transfer Denied Jan. 28, 2003.

Bernard Balkin, Kansas City, for appellants.

Mark Brennan, Kansas City, for respondents.

RONALD R. HOLLIGER, Judge.

Western Container Corporation retained respondents (hereinafter "Grant Thornton" or "Thornton") to perform financial audits of its books for fiscal years ending September 30 for 1992, 1993, 1994, 1995, and 1996. Sometime later it was discovered that Western Container's controller had stolen over $334,000 from Western Container during those years. Appellants Lumbermens Mutual Casualty Co. (hereinafter "Lumbermens") and Reliance Insurance Company (hereinafter "Reliance") issued policies of fidelity insurance to Western Container for the years identified. After payment of the losses under the policies, Lumbermens and Reliance (collectively "the plaintiffs"), as subrogees, sued Grant Thornton for professional negligence and breach of contract in the performance of those audits. The trial court

granted summary judgment in favor of Grant Thornton. Because the trial court erred in finding that there was no legal duty owed by Grant Thornton to Western Container regarding the embezzlements and because there were material facts remaining in dispute, we now reverse.[1]

On appeal, Lumbermens and Reliance claim that the trial court erred in granting summary judgment because it failed to recognize the admitted duty of Grant Thornton to carry out their audits of financial statements in accordance with generally accepted auditing standards. Lumbermens and Reliance claim that the trial court, when granting summary judgment, improperly intruded upon the fact-finding function of the trier of fact in determining that no such duty existed. Lumbermens and Reliance argue that the determination of what are generally accepted accounting principles and auditing standards and whether those standards were met is a matter for expert opinion testimony. They further contend that because both parties offered expert testimony to support their position and it was established that genuine issues of fact existed, this precluded the grant of summary judgment.

## Factual and Procedural Background

In the course of the audits for the years in question it appears to be undisputed that Thornton did not discover Horton's defalcations nor did it evaluate or make any suggestions to Western Container about deficiencies in its internal accounting control policies. While the audits were to be conducted in accordance with generally accepted auditing standards, the engagement letters signed by Western Container

and Grant Thornton explained that "an audit is not a special examination designed to detect defalcations or fraud, nor a guarantee of the accuracy of the financial statements and is subject to the inherent risks that errors, irregularities, or illegal acts, if they exist, might not be detected." As required by the engagement letters, Grant Thornton received representation letters from Western Container, signed by President Richard M. Horton, Vice President Rick N. Johnson, and Controller Susan Horton (daughter of the President who was also the principal shareholder), stating that there had been no irregularities involving management or employees who had significant roles in the internal control structure of Western Container.

During these fiscal years, Controller Susan Horton committed various acts of theft from Western Container. She issued payroll checks to herself in excess of her salary, issued duplicate payroll checks to herself, issued unauthorized checks to herself from the general account, and charged personal purchases to Western Container's credit cards.

On June 18, 1996, Western Container filed a proof of loss with both Lumbermens and Reliance to recover the losses suffered as a result of the acts of Ms. Horton. Subsequently, Lumbermens paid Western Container $154,026.73 and Reliance paid $179,999.70. Upon payment, Lumbermens and Reliance received an assignment of claims from Western Container and were subrogated to the rights of Western Container for claims against Ms. Horton and all others who might be responsible for the losses incurred. As subrogees of such claims, Lumbermens and Reliance brought

1. This is the second time this case comes before us. The first appeal was dismissed because a counterclaim remained pending, and the judgment was not, therefore, final for purposes of appeal. *Lumbermens Mut. Cas. v.*

*Thornton,* 36 S.W.3d 398 (Mo.App.2000). The counterclaim has now been dismissed. We borrow liberally from that case's statement of the facts and issues without further attribution.

suit against Grant Thornton alleging negligence and breach of contract in the performance of their auditing services. Generally, Lumbermens and Reliance claimed in their first amended petition that Grant Thornton failed to analyze, review, and assess material weaknesses in Western Container's internal control environment, structure, and procedures, and failed to design procedures or provide recommendations that would remedy those weaknesses.

Grant Thornton filed their answer denying these allegations and asserting various defenses. Grant Thornton alleged that as subrogees of Western Container, Lumbermens and Reliance were subject to all of Grant Thornton's defenses against Western Container. Among those defenses, Grant Thornton alleged that the claims of Lumbermens and Reliance were barred by Western Container's breach of contract in that Western Container provided incorrect and false information to Grant Thornton that interfered with the performance of the audit.

On September 4, 1998, Grant Thornton filed a motion for summary judgment claiming that they did not make material misstatements or omissions and did not fail to disclose any matter that they were obligated to disclose during the audits of the financial statements of Western Container. Grant Thornton further claimed that Western Container's misrepresentations precluded any recovery as a matter of law. In their suggestions in support, Grant Thornton alleged that they had no general duty to report undetected material internal control weaknesses to Western Container and that their audit reports contained no material misstatements. Finally, Grant Thornton claimed that the actions of Western Container in providing misstatements and false representations precluded recovery by Lumbermens and

Reliance because Grant Thornton relied on these representations in conducting the audits. Specifically, the representation letters stated that there had been no irregularities involving individuals who had significant roles in the internal control structure. Three officers—the President, Vice–President and the Controller, signed each of the representation letters. The Controller, Susan Horton, was responsible for the losses.

On July 21, 1999, the trial court found that "[t]he defendants' engagement letters read in conjunction with Western Container's representation letters, clearly demonstrate that no duty existed nor was created under the terms of these letters, that defendants were to report material weaknesses in internal controls to Western Container." Furthermore, the court found that no duty existed under generally accepted auditing standards and that Lumbermens and Reliance were subject to all defenses against Western Container. Lumbermens and Reliance appeal the trial court's granting of summary judgment in favor of Grant Thornton.

## Standard of Review

Rule 74.04(c)(3) provides that summary judgment shall be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." We review the summary judgment record in the light most favorable to Lumbermens and Reliance, against whom judgment was entered. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). To defeat a motion for summary judgment, a genuine issue must be real and substantial, *Id.* at 378, *and* not merely "argumentative, imaginary or frivolous." *Rustco Prods. Co. v. Food Corn, Inc.*, 925 S.W.2d 917, 922 (Mo.App.1996). Nevertheless, the non-movant is entitled to

the benefit of all reasonable inferences supported by the record. *Martin v. City of Washington,* 848 S.W.2d 487, 489 (Mo. banc 1993). Because the propriety of entering summary judgment is a question of law, our review is essentially *de novo,* and we give no deference to the trial court's findings or determination. *ITT,* 854 S.W.2d at 376.

A defending party seeking summary judgment must show either (1) facts that will negate any one of the elements of the plaintiff's claim; (2) that the plaintiff has not been able to put forth and will not be able to produce evidence that would allow the trier of fact to find the existence of any one of the elements of the plaintiff's claim; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support a properly pleaded affirmative defense. *Id.* at 381. In a negligence case, a motion seeking summary judgment may test whether a defending party had any legal duty to the claimant. *See Stitt by Stitt v. Raytown Sports Ass'n, Inc.,* 961 S.W.2d 927, 930 (Mo.App.1998). Summary judgment is frequently inappropriate in a negligence case particularly where the issue is whether there are facts upon which the trier of fact could find a breach of an admitted or otherwise established duty. *See, e.g., O.L. v. R.L.,* 62 S.W.3d 469, 473 (Mo.App.2001).[2]

### The Duty Analysis

■ It seems implicit in the parties' arguments that they do not agree as to the source of any duty owed by Thornton to Western Container in connection with the audits. A legal duty owed by one to another may arise from at least three sources: (1) it may be proscribed by the legislative branch; (2) it may arise because the law imposes a duty based on the relationship between the parties or because under a particular set of circumstances an actor must exercise due care to avoid foreseeable injury; or (3) it may arise because a party has assumed a duty by contract (agreement) whether written or oral. *Scheibel v. Hillis,* 531 S.W.2d 285 (Mo. banc 1976).

In order to understand and frame the parties' arguments about the existence of a legal duty in this case, we must repeat some facts concerning the defalcations of Western Container's controller, Susan Horton. Thornton contends that Lumbermens' and Reliance's principal theory is that Thornton had a duty to discover and report material weaknesses in Western's internal controls and, more particularly, that Horton performed duties that should have been segregated. Although at this procedural stage this evidence is not completely laid out, it would presumably include arguments that the same person who signs and approves payroll checks should not be the person verifying the payroll accounts, that the same person making credit card charges should not be the one to verify authorization for or propriety of those charges, etc. In fact, for present purposes in reviewing summary judgment, it does not appear that Thornton argues that there were no important or material weaknesses in Western's internal controls.

Lumbermens and Reliance assert that the elements of their claim against Thornton are: (1) the existence of a professional duty on the part of the accountants to their client, Western Container; (2) breach of that duty; and (3) injury or damage proximately caused by the breach. In essence, Lumbermens and Reliance argue that public accountants and auditors are

---

**2.** Although plaintiffs asserted theories of both negligence and breach of contract, we treat them together since the breach of contract theory essentially alleges the same negligent performance as contained in the negligence count.

obligated, like all learned professions, to exercise that degree of skill, care, knowledge, and judgment usually exercised by members of that profession whether the claim against them be asserted in tort or contract. As a corollary, they assert that due care must be exercised in accordance with accepted professional standards.

Thornton does not dispute this general argument but apparently contends that the professional duty may be limited in three ways. First, it argues that, under auditing standards to be discussed more extensively below, it had no duty to examine Western Container's system of internal controls. Secondly, it argues that the scope of an auditor's duty is governed by the contract of engagement. Finally, it contends that the scope of a duty voluntarily assumed under the terms of a contract is limited to the contractual undertaking. Thornton asserts that, because of each of these points, they could not, as a matter of law, be found negligent for failing to discover weaknesses in their client's internal control structures. They cite no Missouri cases for these propositions.

The factual circumstances that underpin these arguments begin with the letters of engagement by which Western retained Thornton to audit balance sheets and related statements of earnings, retained earnings, and cash flows. Separate letters were signed for each year but they are substantially identical. Relevant portions of each letter stated:

> Our audits will be made in accordance with generally accepted auditing standards and will include our examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates by management, as well as evaluating the overall financial statement presentation . . .

> Generally accepted accounting auditing standards also require the auditor to obtain reasonable, but not absolute, assurance that the financial statements are free of material misstatements and provide for the audits to be performed on a test basis . . .

> Accordingly an audit is not a special examination designed to detect fraud, not a guarantee of the accuracy of the financial statements and is subject to the inherent risk that errors, irregularities, or illegal acts, if any exist, might not be detected.

> . . .

> However, if we become aware of any material errors or any irregularities or illegal acts during the course of our audits, we will bring them to your attention.

> Should you then wish us to direct special auditing procedures to such matters, we would be pleased to work with you to develop a special engagement for that purpose.

After execution of the engagement letters and in accordance with their requirements, certain principals of Western gave representations to Thornton including the following:

> There have been no: Irregularities involving management or employees who have significant roles in the internal control structure.

Susan Horton, the controller, was one of the signers of each of the representation letters given by Western to Thornton.

■ The trial court stated in its summary judgment that "the scope of the duty is governed by the terms of the contract." This statement is only partially correct. Thornton acknowledges that its duty is proscribed by and must satisfy generally accepted accounting and auditing standards. Moreover, although not mentioned

by the parties, the Missouri State Board of Accountancy, as part of the professional licensing of certified public accountants under § 326.286, RSMo Supp.2001, has promulgated regulations concerning professional standards of licensed CPA's such as Thornton. 4 C.S.R. § 10–3.030(2) requires a licensee to comply:

> [W]ith applicable generally accepted auditing standards. Statements on auditing standards issued by the American Institute of Certified Public Accountants, and other pronouncements having similar generally recognized authority, are declared to be interpretations of generally accepted auditing standards.

The Supreme Court has stated the question as whether the accountant has exercised the degree of skill and learning ordinarily used by members of the accounting profession. *Deutsch v. Wolff*, 994 S.W.2d 561, 571 (Mo. banc 1999). The trial court's statement above, from the judgment, is an erroneous declaration of law, if interpreted to mean that the scope of an accountant's duty is governed only by the terms of the employment contract. As with other learned professions (attorney-client, physician-patient, for example), although the initial relationship arises initially from a contractual relationship, an obligation to use requisite due care is imposed by common law (and perhaps statute or regulation). It has long been settled that despite the contractual beginnings of the relationship, an action against a member of such a

profession for the failure to exercise due care in the performance of contractual obligations sounds in and is governed by tort principles and not those of contract law. *Barnhoff v. Aldridge*, 327 Mo. 767, 38 S.W.2d 1029, 1031 (1931); *Spruill v. Barnes Hosp.*, 750 S.W.2d 732, 733 (Mo. App.1988).

▮▮▮▮ Simply stating those principles, however, does not fully resolve Thornton's argument. A contract of employment (engagement) between a client or patient and a professional is generally required, *Corbet v. McKinney*, 980 S.W.2d 166, 170 (Mo. App.1998),[3] and that contract is important in determining whether the professional has been hired or engaged to perform the particular work which the client later complains was not performed or was performed negligently.[4] It is in this sense that we analyze Thornton's argument. Thornton first relies upon *Majumdar v. Lurie*, 274 Ill.App.3d 267, 210 Ill.Dec. 720, 653 N.E.2d 915 (1995), as standing for the claimed proposition that the duty of an attorney is limited by the scope of the engagement. That statement alone is overly simplistic. In *Majumdar*, the initial and dispositive question was whether, in those facts and circumstances, an attorney for a corporation had any attorney-client relationship with an officer of the corporation to provide certain advice. In the absence of such a relationship, the attorney's duty was held to be to the corporate entity and not an individual officer or director.

---

**3.** Exceptions to this rule would include the duty that may arise where a consulting physician contracts with the patient's treating physician. Such a situation can result in liability absent a direct contractual physician-patient relationship between the consulting physician and the patient. *Corbet* at 169.

**4.** We recognize that mere failure to perform a contract does not give rise to an action for negligence. *Gibson v. Adams*, 946 S.W.2d 796, 802 (Mo.App.1997). Although negligent

performance of the contract is the most obvious theory, a negligence action may also arise from the performance of a contract by an omission where a duty of professional care in the performance of the contract would require the doing of an act that was not done. In other words, if the omission to do an act would independently also constitute a tort, then the action will lie in negligence and not just contract. *Id.*

*Id.* at 918.[5] Missouri law would apparently likewise also hold that the attorney for a corporation would not usually have a personal attorney-client relationship and, therefore, would not owe any duty to an individual shareholder to provide personal advice. *Fanchon & Marco v. Leahy,* 351 Mo. 428, 173 S.W.2d 417 (1943). Other Missouri cases have dealt with the concept that the scope of the attorney-client relationship is limited in scope to the purpose for which the attorney is employed. *Erickson v. Civic Plaza Nat'l Bank,* 422 S.W.2d 373, 378 (Mo.App.1967).[6] We view this principle and *Majumdar* as well as standing for the proposition that a professional cannot be sued for failing to perform some act if either no contractual relationship exists or the employment of the professional was not to include the particular act that is now complained of. In this more limited sense it is correct as Thornton asserts, that if the professional has not been hired for the purpose complained of, then he has no legal duty (as a matter of law) to perform the act.

■ Difficult even for legal commentators to adequately define, the term "duty" has been used in different ways by both commentators and by courts. Prosser used "duty" in terms of the issue of existence of a legal duty but not in terms of what duty or its measure. WILLIAM L. PROSSER & W. PAGE KEETON, THE LAW OF TORTS § 30 at 164 (5th ed.1984). Others have used the term "duty" to encompass and include not only the issue of its existence but also its measure (breach) and its scope. 1 DAN B. DOBBS, THE LAW OF TORTS § 226 at 578 (2d Ed.2001). Consideration of the uses of the term "duty" is of far more than simply theoretical interest. Proper and clear application of its various uses determines the vital distribution of roles between judge and jury. It is universally agreed (or at least held) that the question of whether a duty exists is a question of law and, therefore, a question for the court alone. Similarly, it is agreed that whether the duty that exists has been breached is a question of fact for exclusive resolution by the jury.[7] Harper and James, in *The Law of Torts,* seem to divide the issue into two broad categories: (1) the rules and (2) the application of those rules to the facts of a case.

> Here as elsewhere the court lays down the rules. But the application of those rules to particular facts should be, and in fact usually is, committed to the jury upon the duty issue as upon any other.

3 FOWLER V. HARPER, FLEMING JAMES, JR., & OSCAR S. GRAY, THE LAW OF TORTS, 2nd ed. § 18.8, at 743 (2d ed.1986). Dobbs uses a similar, but more illuminating, categorization:

> ... [L]awyers and judges use the term duty in a variety of different ways, not

---

5. As to an additional claim of malpractice regarding the formation of a different corporation, the *Madjumdar* court found that an attorney-client relationship existed and that a claim was properly stated as to part of the allegations.

6. For other cases dealing with concept in different situations, see *In re Disney,* 922 S.W.2d 12, 14 (Mo. banc 1996), and other cases mentioned therein.

7. Prosser opined that the issue of negligence presents five questions: (1) the sufficiency of the evidence to permit a finding of facts, preliminarily a question of law in the sense that the court determines submissibility; (2) the weight of the evidence as establishing the facts (for the jury alone); (3) the existence of a duty (for the court); (4) general standard of conduct (a legal rule about which the court instructs the jury); and (5) the particular standard of conduct, or in other words, how the facts are applied to the legal standard of conduct (for the jury except where reasonable minds could not differ). *Id.* at § 37 at 235–238.

always with the same meaning. Sometimes they use duty to refer to a general standard or obligation. At other times they use duty as a conclusion about whether the defendant's particular act or omission should be actionable, irrespective of any general standard.

DOBBS, *supra*, at 577. Dobbs then reiterates the importance of distinguishing the difference between rules of law that are capable of general application to particular types of cases and the issue of breach or negligence which requires an analysis of the facts of a particular case in light of the general rule.

> Courts could state an infinite number of duties if they spoke in highly particular terms—a duty to watch out for children, a duty to look when you back your car, a duty to suture the incision after a medical operation, and so on without limit. All such statements are readily comprehensible but they use the term duty to state conclusions about the facts of particular cases, not as a general standard.

*Id.* The "general standard" is another way of stating the issue of whether a legal duty exists—a question for the court. Conclusions about the particular facts of a case are, in the presence of sufficient evidence, an issue for the jury. *Dobbs* suggests considering whether the issue involves a "rule of law capable of legitimate generalization." *Id.* For example, is the question of whether a surgeon has a duty to suture an incision a rule of law capable of generalization to all cases of surgery? Could it be, or should it be, a rule of law that in all surgical cases the surgeon should (as a duty) suture the incision? Of course not. Whether the surgeon should so act is a question of fact for the jury, usually with the aid of expert testimony. So, in one case a court might say, in retrospect, that the surgeon had a duty to suture the incision and in a different case, on different facts, say that the surgeon had no such duty. Such a court has not misused the term duty but simply used it in a different way than it would when deciding a question of law as to whether a duty exists. In other words, duty includes considerations of pure law (existence) and duty also refers to breach. But, in the first case, the court decides whether a duty exists under a set of facts and circumstances to exercise *any* duty of care (whether imposed by statute, the relationship between the parties, or contract) and in the latter, the jury decides whether the defendant has a duty to do or refrain from a particular act under the facts and evidence in the particular case. Thus, it is overly simplistic and, in fact, misleading to state that "duty" is always a question of law.

The importance of understanding that courts sometimes use the term duty in referring to breach helps explain the oft-stated rule that summary judgment is generally inappropriate in a negligence case. *O.L.*, 62 S.W.3d at 473. And this general principle is no less applicable in a professional negligence case, except to the extent that such cases should suffer early disposition because of a paucity of expert testimony. Such cases fail, however, not because there is no duty of the professional to the client or patient but because there is no evidence to show a breach by failing to perform an act or omission that is required by the profession's standard of care (the particular fact-specific duty). Put another way, if there is a general duty to exercise some type of care to the plaintiff and the next question one asks is whether the defendant should or should not have acted in a particular way (or refrained from acting), the analysis is evaluative based on the facts of the case and this determination would almost invariably be an issue for the jury.

■ It is in this context that we evaluate Thornton's arguments. They acknowledge that they agreed to do audited financial statements for Western. Likewise it does not deny that it had the professional obligation to use due care in the performance of that task. They acknowledge that they had a contractual responsibility to perform the audit in accordance with generally accepted accounting standards. As mentioned previously, this is also the standard imposed by 4 C.S.R. § 10–3.030(2) and the common law rule as well. In essence, Thornton argues that they are now being sued for failing to do something that the nature of their engagement did not require. They argue that they were not hired to do a study of Western's system of internal controls and, more specifically, that they were not hired to do that special type of audit intended to detect fraud or defalcations, such as Horton's. But Thornton's arguments miss the point of plaintiff's theory. Plaintiffs allege that the certified financial audit performed by Thornton should have included some evaluation of Western's internal control structure to test the accuracy of their evaluation of Western's financial results. Plaintiffs further claim that a properly designed certified financial audit would have revealed those weaknesses and also Horton's wrongful acts.

We disagree with Thornton's characterization of the plaintiffs' claims. We also explicitly reject Thornton's apparent position that they can only be responsible for reporting weaknesses that they actually know of or discover. Acceptance of that position would encourage blind inattention to an audited firm's financial weaknesses. Rejection of Thornton's argument does not mean that a firm performing a certified audit must exhaustively study a client's internal control systems or perform a special fraud audit when not engaged to do so. Plaintiffs assert that generally accepted accounting standards require careful and prudent performance of a certified financial audit to include the design and performance of the audit to understand Western's internal control environment. In opposition to Thornton's motion for summary judgment, plaintiffs attached deposition excerpts from their expert witness, a certified public accountant who testified that such an evaluation was required under auditing standards. Whether Thornton breached a duty to adequately design their audit is as much a question of fact as is the question of whether the surgeon breaches a duty by failing to suture a patient's wound.

A great deal of attention is directed by Thornton and plaintiffs to various auditing standards and their meaning. The meaning of those standards and their application to the facts of this case is a question of fact to be determined by the trier of fact with the aid of expert testimony. *Deutsch,* 994 S.W.2d at 571. The issues raised do not deal with the question of duty as a matter of law but instead to breach of that duty. In its brief, Thornton acknowledges that accounting standards require "a sufficient understanding of its client's internal controls to plan the audit." Whether such an understanding has been obtained and the audit properly planned and carried out is a question of fact, not law. As there was a material dispute regarding that question, the trial court erred in holding for Thornton on the issue of duty as a matter of law.

Thornton argues alternatively that, even if a duty existed, there is no genuine issue as to its breach. The claim is that, under generally accepted auditing standards SAS 55 and 60, there is no issue factually whether they breached their duty to Western. Thornton dismisses the testimony of plaintiffs' expert witness by calling it conclusory. A review of that testimony indi-

cates that the witness did far more than simply state that Thornton did not exercise due professional care. The witness identified several specific failures in the planning, supervision, and performance of the audit that she believed fell below the standard of care. Essentially, in this point Thornton rehashes the argument rejected above that there is only one possible interpretation of the accounting standards as applied to the facts. To the contrary, the record amply demonstrates that there is a dispute about the application of these standards to the facts. Summary judgment cannot be sustained on this ground.

### Does Thornton's Affirmative Defense Provide An Alternate Ground To Grant Summary Judgment?

██ Finally, Thornton argues in their third point that the trial court properly granted summary judgment because their counterclaim and affirmative defenses asserted against the plaintiffs for Western's knowingly untrue representations provide an alternative ground for summary judgment in their favor. The counterclaim sought recovery against Western based on negligence, common law fraud, and breach of contract, including indemnity. While Thornton's answer raises several affirmative defenses, the only defense raised in its summary judgment motion was that Horton's misstatements to Thornton were attributable to Western Container, barring the latter from recovery. Thornton correctly points to the general rule that summary judgment will be affirmed "if the judgment is sustainable under any theory." *Jos. A. Bank Clothiers, Inc. v. Brodsky*, 950 S.W.2d 297, 300 (Mo. App.1997).

That principle, however, is not applicable in this situation with regard to Thornton's counterclaims because Thornton's counterclaims are simply not before us.

As noted above, the first appeal in this matter was dismissed because the counterclaim was left pending following the trial court's initial grant of summary judgment. After remand, Thornton dismissed its counterclaim. Their claims thereunder, were not before the trial court and are similarly not before this court as a basis for sustaining the summary judgment. Nor do we believe the principle of *Brodsky* is applicable to a counterclaim upon which summary judgment was never sought.

Thus, the sole remaining ground upon which Thornton's motion for summary judgment could be upheld on other grounds concerns the affirmative defense relied upon in Thornton's summary judgment motion. That defense arises from language in the engagement letters which states that Western Container "will indemnify and hold [Thornton] harmless from any liability, damages, and legal or other costs which [Thornton] might sustain" should knowingly untrue representations be made to Thornton in the course of the audit. Thornton contended that Susan Horton's misrepresentations triggered Western Container's obligation to indemnify and hold harmless Thornton for any liability arising out of the audit.

Indemnification is generally asserted in the form of a direct claim against another party, not as an affirmative defense. *See e.g., K.C. Landsmen, L.L.C. v. Lowe–Guido*, 35 S.W.3d 917, 921 (Mo.App.2001); *Buchanan v. Rentenbach Constructors, Inc.*, 922 S.W.2d 467, 470 (Mo.App.1996); *Cass Bank & Trust Co. v. Mestman*, 888 S.W.2d 400, 403 (Mo.App.1994); *Honey v. Barnes Hosp.*, 708 S.W.2d 686, 696 (Mo.App.1986). As stated above, Thornton has dismissed its counterclaim seeking indemnification. However, the "hold harmless" language in the engagement letters seems intended to act as a release or bar to claims by Western Container against Thornton, which is

in the nature of an affirmative defense. To the extent that the quoted clause may be relied upon as an affirmative defense by Thornton, we will address the merits of Thornton's arguments.

As indicated in the quoted passage, the duty of Western Container to indemnify and hold Thornton harmless is only triggered if Western Container knowingly provided misleading information to Thornton. As such, to prevail upon its motion for summary judgment, Thornton was required to present undisputed facts which established that Western Container made misrepresentations. Specifically, Thornton was required to present facts which showed that Susan Horton's misrepresentations to Thornton were made knowingly and, more importantly, could be imputed to Western Container.

 Thornton stresses the fact that Horton knowingly made false representations to Thornton and argues on appeal that this conduct and knowledge is imputable to Western Container. Thornton is correct that, normally, the acts of a corporation's agent are imputable to its principal. *Miller v. Ernst & Young*, 938 S.W.2d 313, 315 (Mo.App.1997). This Court, however, has recognized an exception to that principal when the agent is acting adversely to the principal's interest. *See Grove v. Sutliffe*, 916 S.W.2d 825, 830 (Mo.App. 1995). This exception has been termed the "adverse interest exception." *Id.* The exception provides that if the agent's actions were to the detriment of the principal, then the agent's actions will not be imputed to the principal except under very limited circumstances. Conversely, where the agent's actions were actually beneficial to the principal, the exception is not applicable and the agent's actions will be imputed to the principal. *See Miller*, 938 S.W.2d at 316.

Here, Thornton alleged no facts showing that the adverse interest exception did not apply in this matter. Nor did it allege facts that established that Western Container was otherwise aware of the misrepresentations until after Horton's defalcation was discovered. Thus, even if Horton knowingly made knowing misrepresentations to Thornton, Thornton's motion fails because it neglects to present undisputed facts showing that those misrepresentations are legally attributable to Western Container or that Western Container had actual knowledge of the misrepresentations at the time they were made. Having failed to allege sufficient facts to establish that it is entitled to the affirmative defense as a matter of law, Thornton cannot prevail on its motion for summary judgment upon that basis. Point denied.

The summary judgment is reversed and the case remanded to the trial court.

HAROLD L. LOWENSTEIN, Presiding Judge, and THOMAS H. NEWTON, Judge, concur.